**ALLEGHENY LUDLUM
CORPORATION,**
Petitioner

v.

**WORKERS' COMPENSATION AP-
PEAL BOARD (BASCOV-
SKY), Respondent.**

Commonwealth Court of Pennsylvania.

Argued May 4, 2009.
Decided June 17, 2009.

Lawrence J. Baldasare, Pittsburgh, for petitioner.

Mark C. Stopperich, Washington, for respondent.

BEFORE: McGINLEY, Judge, SMITH–RIBNER, Judge, and FRIEDMAN, Senior Judge.

OPINION BY Judge McGINLEY.

Allegheny Ludlum Corporation (Employer) petitions for review from an order of the Workers' Compensation Appeal Board (Board) that reversed the Workers' Compensation Judge's (WCJ) denial of Edward Bascovsky's (Claimant) petition to review benefit offset.[1]

On September 17, 2003, Claimant petitioned for review of compensation benefit offset and requested "a review of the benefit offset calculation made by employer due to Employee's [Claimant's] receipt of retirement pension benefits." Petition to Review Compensation Benefit Offset, September 17, 2003, at 1; Reproduced Record (R.R.) at 2a. On September 18, 2003, Employer filed an answer and asserted that "[a]ll allegations contained in claimant's petition are denied at this time as defendant [Employer] is without sufficient information to ascertain same . . . [s]trict proof will be demanded at the time of hearing." Answer to Petition, September 18, 2003, at 1; R.R. at 3a.

Hearings were conducted on October 8, 2003, January 13, 2004, and March 18, 2004. Claimant testified that he began to receive pension benefits on July 1, 2003, in the amount of $1,229.37 and that he also received on the same date a lump-sum net payment in the amount of $7,259.78. Notes of Testimony, October 8, 2003, (N.T. 10/08/03) at 7; R.R. at 9a. Claimant stated that he attended a meeting to discuss the "[m]oney we would receive and what . . . lump-sum payment we got." N.T. 10/08/03 at 8; R.R. at 9a. "Patty Thomas [a company representative] was there . . . [and][s]he was asked questions about the people that were on Workers' Comp, if it would effect [sic] retirement checks." N.T. 10/08/03 at 8–9; R.R. at 9a. Claimant was informed that the lump-sum payment was based on vacation pay. N.T. 10/08/03 at 9; R.R. at 9a. Claimant stated that Employer paid his pension benefits from July 1, 2003, and that Bethlehem Steel would begin to pay his pension benefits in 2008. N.T. 10/08/03 at 15; R.R. at 11a.

For Employer, John L. Scarfutti (Scarfutti), Vice President of Human Resources, testified that he was involved in labor negotiations with Employer and

---

1. Gary Tarr (Tarr) also filed a petition for review of benefit offset which was heard and decided by the WCJ along with Claimant's petition. Tarr is not a party to this appeal.

Bethlehem Steel Company and that "[v]ery simply as in any negotiation there would be proposals made by either party and ultimately there would be a resolution of those proposals" and "that would result in a settlement that would determine what the pension multipliers, what the pension percentage with those things would have been during those three negotiations." Notes of Testimony, January 13, 2004, (N.T. 1/13/04) at 9; R.R. at 18a. Employer purchased the Houston plant from Bethlehem Steel Company on November 20th, 1998. N.T. 1/13/04 at 11; R.R. at 19a. Prior to Bethlehem Steel's operation of the plant "[t]here were two predecessor companies ... Lukens Steel ... and Washington Steel...." N.T. 1/13/04 at 11; R.R. at 19a. As part of the negotiations with Bethlehem Steel, Employer "recognized all past employment, whether it was Washington Steel, Lukens Steel or Bethlehem, as related to pensions when and if a person retired from Allegheny Ludlum [Employer]." N.T. 1/13/04 at 11; R.R. at 19a. Scarfutti stated that if an employee was eligible for an immediate pension from Bethlehem Steel after the transition between the two companies Bethlehem Steel and Employer would each pay a portion of the pension. N.T. 1/13/04 17; R.R. at 20a.

In regards to the special payment paid to Claimant, Scarfutti stated that the calculations were based on Employer's vacation rate. "The vacation rate is ... the very best-blended average weekly of earning that our labor agreement generates." N.T. 1/13/04 at 23; R.R. at 22a. "What i[t] does is it looks at the prior calendar year and it looks at the total earnings, all classes of earnings. It divides by the number of hours worked ... [i]t then gives you an average hourly rate of earnings." N.T. 1/13/04 at 23; R.R. at 22a. "If the person did not take any vacation prior to retirement, the special payment would be then either 13 weeks or 14 weeks" and if vacation is exhausted the special payment "would then be equal to either eight or nine weeks of vacation pay." N.T. 1/13/04 at 24–25; R.R. at 22a. Scarfutti said that Employer "received no money related to pensions from Bethlehem or any of the predecessor companies." N.T. 1/13/04 at 39; R.R. at 26a. Scarfutti said that Employer's pension fund was under funded until it merged its pension fund with Teledyne Corporation. N.T. 1/13/04 at 41; R.R. at 26a. After the merger, Employer's pension fund was over funded. N.T. 1/13/04 at 41; R.R. at 26a. Finally, Scarfutti stated that "[w]hen Bethlehem went into Chapter 11, PBGC [Pension Benefit Guarantee Corporation] ... they take the pension trust [and it] guarantees pensions to some extent ... [i]t's normally on average somewhere around 80 percent of what the company promised ... [s]o it's a reduced benefit." N.T. 1/13/04 at 43; R.R. at 27a.

Patricia A. Thomas (Thomas), Pension Plan Administrator for Employer, testified that Employer outsourced all pension responsibilities to Mellon HR Solutions. N.T. 1/13/04 at 51; R.R. at 29a. Thomas stated that Employer would add $400.00 to an employee's pension benefit if he or she was not collecting social security. N.T. 1/13/04 at 51; R.R. at 29a. "[T]he $400.00 supplement is paid until age 62 [2] when one is eligible to collect 80% of their benefits from Social Security." N.T. at 51;

2. Presently, under the Social Security Act, a retiree may still elect to retire as early as age sixty-two but at a thirty percent reduction in his or her retirement benefits. A retiree born in the year 1937 or earlier will still receive full retirement benefits at the age of sixty-five. Any retiree born in the year 1960 or later will receive full retirement benefits at the age of sixty-seven. Social Security Administration, http://www.ssa.gov.

R.R. at 29a. Thomas stated that even if the employee elects to retire at the age of sixty-five the $400.00 supplement is still discontinued. N.T. 1/13/04 at 52–53; R.R. at 29a. Thomas concluded:

> Let's say the person retires from Allegheny Ludlum [Employer] and he's not eligible to receive his Bethlehem Steel pension until age 65. Allegheny Ludlum [Employer] pays the full benefit for that participant until age 62 or later when he becomes eligible to collect 80 percent of his Social Security. At that time we use his frozen benefit from Bethlehem Steel, $800 and we reduce it by the factor which in this case for the Houston people it was 7.53, the reduction factor. And then that is reduced from their Allegheny Ludlum pension and we would then pay a new amount.

N.T. 1/13/04 at 53; R.R. at 29a.

The WCJ made the following pertinent findings of fact:

. . . .

2. On December 19, 2001, Edward Bascovsky [Claimant] sustained an injury while working for employer. The injury was recognized by a notice of compensation payable listing a compensation rate of $485.11 per week based on an average weekly wage of $727.66 and which described the injury as a sprain/strain of the left upper arm and shoulder.

. . . .

4. On July 25, 2003, employer issued a corrected notice of workers' compensation benefit offset by which it indicated that it was going to take an offset for pension benefits received by Edward Bascovsky [Claimant]. *The notice stated that an offset credit of $283.33 will be deducted from Mr. Bascovsky's [Claimant] weekly benefits beginning on August 13, 2003. The notice further stated that Mr. Bascovsky's [Claimant] benefits will be suspended for 37 weeks or until April 18, 2004, to recover an overpayment. The notice explained that for the months of April through June of 2003 Mr. Bascovsky [Claimant] received a lump sum payment of $7,259.78 which equates to $557.58 per week and that as of July 1, 2003, he received a monthly pension of $1,229.67 which equates to $283.33 per week.* (emphasis added).

. . . .

6. Although there is only a corrected notice of benefit offset of record for Mr. Bascovsky [Claimant], there was obviously a prior notice of benefit offset issued. Mr. Bascovsky [Claimant] filed a petition for review of benefit offset after both the original and the corrected notices were issued . . . .

. . . .

10. During the course of the hearings, counsel for claimants explained that the first issue involved in this case is whether the lump sum received by the claimants at the time they retired should be considered as part of their pension. *The second issue raised by counsel is whether employer should be entitled to take an offset for 100% of the pension amount when this is a multi-employer situation and the Bureau's regulations provide that employers are only entitled to take an offset for the proportion which they contributed to the employee's pension.* (emphasis added).

. . . .

13.a. Mr. Bascovsky [Claimant] was born August 7, 1945.

b. Mr. Bascovsky [Claimant] received an award of pension benefits as of July 1, 2003, and his pension amount per month is $1,229.67. He also received a lump sum payment around the same time of $7,259.78.

c. At some point Mr. Bascovsky [Claimant] attended a meeting called by

employer to explain the plant shut down and benefits that employees were supposed to receive. *Ms. Thomas explained at the meeting that the lump sum payment was vacation payoff.* During a subsequent phone call she explained that Mr. Bascovsky's [Claimant] lump sum payment was payment of nine weeks of vacation pay. *Ms. Thomas and another company representative explained at the meeting that if people were on workers' compensation, it would not affect their retirement checks.* (emphasis added).

. . . .

f. *On cross-examination, Mr. Bascovsky acknowledged that his pension is being paid by employer and not any of the prior owners of the plant.* (emphasis added).

. . . .

14.d. Mr. [John] Scarfutti [Vice–President of Human Resources] . . . further explained that if they [employees] were eligible for an immediate pension from Bethlehem Steel at the time employer purchased the facility [Houston Plant], Bethlehem would pay a portion of the pension and employer would pay a portion of the pension so there would actually be two pension checks received by the employee. *Mr. Scarfutti stated that most of the employees were not eligible for an immediate pension from Bethlehem Steel at the time of the purchase.* (emphasis added).

e. *Mr. Scarfutti explained that the facility was purchased in November of 1998, but because of changes in the market employer shut down the melt shop portion of the facility permanently in December of 2001 . . . .* (emphasis added).

f. *Mr. Scarfutti testified that at the time an employee retires, he or she receives a lump sum called a special pay-*

*ment which he described as a pension benefit for the first three months after the person retires. He further testified that it is paid out of the pension trust and it is prior to the beginning of the normal monthly annuity payment.* Mr. Scarfutti further explained that the pension trust can only be used for pension payments and, if the trust is over-funded, retiree medical payments. He added that the trust cannot be used to make vacation payments. Mr. Scarfutti acknowledged that the calculation of the special payment is based on the vacation rate . . . . (emphasis added).

g. On cross-examination, Mr. Scarfutti stated that the employer's pension trust was over-funded at the time of the purchase of the Houston facility. *He further stated that to his knowledge, employer had not made any cash contribution to the pension trust since the date of the purchase of the facility.* (emphasis added).

. . . .

i. *Mr. Scarfutti testified that employer is not using money that accrued from previous employers to pay the claimants' pension benefits.* He further explained that in August of 1996 employer merged with Teledyne Corporation which had a pension plan that was significantly over-funded. *Mr. Scarfutti explained that the pension plans of the two companies were merged so that the consolidated pension plan was over-funded.* He further explained that Bethlehem Steel had its own pension plan which is separate from employer's pension plan. *He further explained that employer is picking up the full pension payment for the claimants until they reach the age where they become eligible for a pension from Bethlehem Steel's plan at which point Bethlehem will start paying some portion of the pension.*

15.f. On cross-examination, Ms. Thomas acknowledged that she did not have an understanding with respect to the effect the receipt of pension benefits may have on workers' compensation benefits. She again stated that she did not recall anyone asking during the presentation about the effect of pension benefits on workers' compensation benefits.

. . . .

19. I accept the testimony of Mr. Scarfutti as credible. His testimony is essentially uncontradicted. *There was no evidence offered which would refute his explanation of employer's pension plan.* (emphasis added).

20. With respect to Ms. Thomas and both claimants [Bascovsky and Tarr], I also accept the testimony of these witnesses as credible. . . . I also believe that because Ms. Thomas' job involves pension benefits and she made no representation during her testimony that she has any knowledge of workers' compensation law, that she would not have given an opinion on the effect of the receipt of pension benefits on workers' compensation benefits.

21. *I find that the special payment or lump sum payment is part of each claimant's pension and is properly subject to the offset. I base this finding on the fact that the payment is made from the pension trust and the fact that no other pension benefits are received for the first three months after retirement.* (emphasis added).

22. *I find that the pension benefits which the claimants are currently receiving are in fact fully funded by the employer and are not from a multiemployer pension plan. Employer is therefore entitled to the full offset for these payments.* (emphasis added).

WCJ's Decision, October 11, 2005, Findings of Fact (F.F.) Nos. 2, 4, 6, 13a-c, and f, 14(d-g and i), 15f, 19, and 20–22 at 3–10; R.R. at 82a–89a. The WCJ concluded that Employer "properly took an offset for the special payment or lump sum payment" and "the monthly pension benefits currently received by" Claimant. WCJ's Decision, Conclusions of Law Nos. 1 and 2 at 11; R.R. at 90a.

The Board reversed and concluded:

After careful review of the record, we conclude that the WCJ erred by determining that Defendant [Employer] met its burden of establishing that it was entitled to an offset of Claimant's lump sum payment and monthly pension benefits under these circumstances. *Defendant [Employer] is the employer liable for Claimant's workers' compensation benefits, and as such, is only entitled to an offset to the extent that it funded the pension plan.* Section 204(a), 77 P.S. § 71. Furthermore, in order to be entitled to an offset, it had to present evidence of the amount that it *actually* contributed to the claimant's pension plan in order to be entitled to an offset. King. (emphasis added and in original).

. . . *As part of the merger agreement, Defendant [Employer] decided to consolidate its pension plan with Teledyne's. Neither Mr. Scarfutti nor Ms. Thomas was able to testify concerning specifically what, if any, contributions were made to the pension plan by Defendant [Employer].* Rather, Mr. Scarfutti merely testified in general terms that the company's actuaries determine the amount of contributions based on a blended composite liability of all its hourly employees, and the actuaries make this determination based on "a very complicated formula" with "more factors than [he] was comfortable with." This testimony was not sufficient to meet Defendant's [Employer] burden . . . . (emphasis added).

Board's Opinion, September 12, 2008, at 10.

■ On appeal, Employer contends[3] that the Board erred when it concluded that Employer was not entitled to an offset under Section 204(a) of the Workers' Compensation Act (Act)[4], 77 P.S. § 71. Specifically, Employer asserts that the uncontroverted evidence established that the pension plan, from which Claimant's benefits were paid, was funded solely by Employer.

## I. The Legislative Intent For Enactment Of Section 204(a) Of The Act.

In *Pennsylvania State University v. Workers' Compensation (Hensal)*, 911 A.2d 225, 227 (Pa.Cmwlth.2006)[5], this Court noted:

In 1996, the legislature, attempting to combat the increasing costs of workers' compensation in Pennsylvania, amended Section 204(a) of the Act to allow employers an offset against workers' compensation benefits for social security, severance, and pension benefits simultaneously received by an employee.

The amended Section 204(a) now provides in relevant part:

The severance benefits paid by the employer directly liable for the payment of compensation and *the benefits from a pension plan to the extent funded by the employer directly liable for the payment of compensation* which are received by an employee *shall also be credited against the amount of the award* made under sections 108 [occupational disease] and 306 [total and partial disability], except for benefits payable under section 306(c) [specific loss benefits]. . . .

77 P.S. § 71 (emphasis in original).

*Id.* at 227

■ In *Hensal*, this Court further noted:

a penalty petition. The WCJ concluded that Penn State failed to establish what contributions that it made to Hensal's pension. Although the WCJ acknowledged that Penn State's evidence may have been valid, the Act required that actual contributions be established before an offset was permissible. The Board affirmed.

This Court had originally affirmed the Board but subsequently granted Penn State's application for reconsideration. This Court vacated and remanded:

The WCJ here failed to make credibility determinations on Employer's [Penn State's] evidence. Although he recognized Employer's [Penn State's] evidence may be valid the WCJ (and later the Board) erroneously concluded Employer was required to prove net contributions before an offset will be permitted. Because Employer's [Penn State's] evidence, if credited, is sufficient to meet its burden of proof, we vacate ... and remand, with directions that the case be further remanded to a WCJ for additional findings based on the existing record.

*Id.* at 233.

---

3. This Court's review is limited to a determination of whether an error of law was committed, whether necessary findings of fact are supported by substantial evidence, or whether constitutional rights were violated. *Vinglinsky v. Workmen's Compensation Appeal Board (Penn Installation)*, 139 Pa.Cmwlth.15, 589 A.2d 291 (1991).

4. Act of June 2, 1915, P.L. 736, *as amended.*

5. In *Hensal*, Robert Hensal (Hensal) had sustained a work-related injury on February 21, 2002. Pennsylvania State University (Penn State) issued a notice of compensation payable and Hensal was awarded total disability benefits. In October of 2002, the State Employees' Retirement System (SERS) granted Hensal a disability pension. "In January 2004, Employer [Penn State] filed a petition to modify benefits alleging entitlement to an offset against its workers' compensation obligation due to Claimant's [Hensal's] receipt of a disability pension." *Id.* at 226. Penn State then filed a notice of workers' compensation benefit offset pursuant to Section 204(a) of the Act, 77 P.S. § 71. Hensal responded with

Amended Section 204(a) serves the legislative intent of reducing the cost of workers' compensation by allowing an employer to avoid paying duplicate benefits for the same loss of earnings.... Similarly, Section 204(a) implicitly recognizes that public policy bars an employer from utilizing an employee's own retirement funds to satisfy its workers' compensation obligations .... (citations omitted).

*Id.* at 228.

## II. The Bureau's Applicable Regulations Adopted In Response To Section 204(a) Of The Act.

This Court recognized in *Hensal* that the Legislature failed to lay out in Section 204(a) of the Act any method of calculating the offset or how to compute the extent funded by the employer to arrive at an amount to be credited against the amount of the award. In response to this omission, the Bureau adopted 34 Pa.Code § 123.8.

34 Pa.Code § 123.8 (Offset for pension benefits generally) provides:

(a) *Workers' compensation benefits otherwise payable shall be offset by the net amount an employe receives in pension benefits to the extent funded by the employer directly liable for the payment of workers' compensation.* (emphasis added).

(b) The pension offset shall apply to amounts received from defined-benefit and defined-contribution plans.

(c) The offset may not apply to pension benefits to which an employe may be entitled, but is not receiving.

(d) In calculating the offset amount for pension benefits, investment income attributable to the employer's contribution to the pension plan shall be included on a pro rata basis.

Further, 34 Pa.Code § 123.10 (multiemployer pension fund offset) provides:

(b) *To calculate the appropriate offset amount, the portion of the annuity purchased by the liable employer's contribution shall be determined by the pension fund's actuary.* The ratio of the portion of the annuity purchased by the liable employer's contributions to the total annuity shall be multiplied by the net benefit received by the employee from the pension fund on a weekly basis. The result is the amount of the offset to be applied to the workers' compensation benefit on a weekly basis. (emphasis added).

## III. Employer's Memorandum Of Agreement And Pension Plan.

*Memorandum of Agreement*

. . . .

(a) This language is intended to be consistent with the language contained in Section 8.04 entitled "Employment and Employee Benefit Matters" of the Agreement of Purchase and Sale....

(b) ... *ALC [Allegheny Ludlum Corporation/Employer] and the USWA [United Steelworkers of America] shall become parties to a Pension Agreement covering Transferred Employees [employees of Bethlehem Steel Corporation (BSC), pursuant to BSC's acquisition of Luken Steel Company] which provides substantially the same benefits as provided under the BSC Pension Agreement* ... [t]hat is, the essential plan terms will be identical.... All former BSC employees hired by ALC in connection with this transaction will be immediately eligible to participate in the New Pension Agreement. (emphasis added).

(c) The ALC Pension agreement will grant past service credit to Transferred Employees for their BSC pension service for purposes of eligibility,

vesting, benefit accrual, distribution provisions and all types of retirement and survivor's benefits provided under the BSC Pension Agreement. For purposes of this Memorandum, the term "BSC Pension Agreement means the former Lukens Pension Agreement for the Washington Steel Corporation employees...."

....

(j) *ALC [Employer] agrees that all benefits payable under the ALC Pension Agreement will be funded under the Allegheny Teledyne Incorporated Pension Plan.* (emphasis added).

*2. Defined Contribution Plans–401(k) Plans*

(a) Houston Plant [6]:

1) *ALC will adopt defined contribution plans with substantially similar terms to those presently provided by BSC for the Transferred Employees. ALC will recognize all obligations under the terms of the respective defined contributions pension plans except as modified below.* (emphasis added).

2) ALC will pay the costs to retain Vanguard for the respective DCP/401(k) Plans for all monies contributed whether Company contributions or Salary Reduction contributions through the terms of this Agreement....

....

*Calculation of Pension Benefits*

Pension amounts and the periods for which they are payable are determined as follows:

*Special Payment*

The special payment is the payment for the first three full calendar months following the month in which retirement occurs .... It is a lump sum equal to 13 weeks of vacation pay (14 weeks of vacation pay in the case of employees eligible

for more than four weeks of regular vacation in the year of retirement) reduced by any regular vacation pay received for the year of retirement or for an earlier year if the participant is not entitled to vacation in the year of retirement .... (emphasis added).

*Regular Pension*

The Regular Pension is a monthly payment equal to the higher of the percent pension or the minimum pension determined....

Memorandum Of Agreement Between Allegheny Ludlum Corporation and the United Steelworkers of America, Defendant's Exhibit A, January 13, 2004, at 1–3 and 15–16; R.R. at 52a–56a.

**IV. The Documentary And Testimonial Evidence In Support Of The WCJ's Credibility Determinations.**

■ Here, the evidence established that Employer was not required to produce actuarial testimony to support an offset.

**First,** the Memorandum of Agreement specifically stated that Employer (ALC) and the USWA adopted a "defined contribution plan" that was similar to the plan utilized by Bethlehem Steel when it owned the Houston Plant.

34 Pa.Code § 123.2 (Definitions) defines the term "defined contribution plan" as:

*A pension plan which provides for an individual account for each participant and for benefits based solely upon the amount of accumulated contributions and earnings in the participant's account.* At the time of the retirement the accumulated contributions and earnings determine the amount of the participant's benefit either in the form of a lump-sum distribution or annuity.

34 Pa.Code § 123.2 defines the term "defined benefit plan" as "[a] pension plan in which the benefit level is established at

---

**6.** Again, Claimant was employed at the Houston Plant.

the commencement of the plan *and actuarial calculations determine the varying contributions necessary to fund the benefit at an employee's retirement.*" (emphasis added).

Although factually distinguishable [7], this Court's analysis in *Hensal* is instructive concerning the difference between a "defined contribution plan" and a "defined benefit plan":

> As previously noted, a *defined contribution plan* is an individualized retirement account ... [and] [b]ecause the account is individualized, *employer contributions to the employee's pension are easily ascertained.*
>
> In contrast, a *defined benefit pension plan* is designed to provide an employee with a set benefit amount based on factors known only at retirement, such as length of employment and retirement age....
>
> ....
>
> *Because an appreciation of the funding of defined pension plans requires knowledge beyond that possessed by laypersons, it is a subject particularly amenable to testimony by experts ....* This approach is consistent with common sense and with testimony that the extent to which an employer funded a particular employee's defined benefit pension can only be determined by an actuarial formula. *The approach is also consistent with the regulation for evaluation of offset for multi-employer plans, which requires that the portion of the annuity purchased by the liable employ-*

er *be determined by the pension fund's actuary ....* (citations omitted and emphasis added).

*Id.* at 231–32. Here, under the "defined contribution plan" Employer's contribution is calculated solely on the accumulated contributions and earnings in the employee's account. *See* 34 Pa.Code § 123.2.

**Second,** in support of the "defined contribution plan", the WCJ found that Claimant's pension was solely funded by Employer and not multi-employers [8]:

> 14.h. *On cross-examination, Mr. Scarfutti disagreed ... that ... [the] pension amount is based on contributions made by employers other than Allegheny Ludlum [Employer].* Mr. Scarfutti explained that the claimants were not eligible for an immediate pension from Bethlehem Steel at the time employer took over the plant and because they then subsequently retired from employer, *employer is paying the total amount of the pension.* He further explained that the claimants may become eligible for retirement benefits from Bethlehem Steel at some point in the future. Mr. Scarfutti pointed out that Bethlehem Steel is in chapter 11 bankruptcy. (emphasis added).
>
> ....
>
> 15.j. On re-direct examination, *Mr. Scarfutti clarified that neither Bethlehem Steel nor any of the other prior employers put any money into the pension trust that is currently paying the claimants' pension benefits.* (emphasis added).

---

7. In *Hensal*, Penn State, a public employer, and Hensal, an employee, were both mandated under the State Employees' Retirement Code (Retirement Code), 71 Pa.C.S. §§ 5101–5956 to contribute to the pension fund. *Id.* at 228. "Moreover, Employer [Penn State], as a state-affiliated university, is 'totally responsible for all employer contributions under section 5507 (relating to contributions by the Commonwealth and other employers)' 71 Pa. C.S. § 5102 ... [t]hus, the pension fund is

supported by employee and employer contributions, and investment income." *Id.* at 228–29. Hensal was a member of SERS which provided for a "defined benefit plan." As a result, this Court determined that actuarial testimony was required.

8. The multi-employers were Bethlehem Steel, Washington Steel, and Lukens.

WCJ's Decision, F.F. Nos. 14.h. and 15.j. at 6–7; R.R. at 87a–88a.

In fact, Claimant acknowledged that Employer was paying his pension benefits and not any prior employers. N.T. 10/08/03 at 14–15; R.R. at 11a. *See also* WCJ's F.F. No. 13.f. at 4; R.R. at 85a.

**Third,** Claimant retired on April 1, 2003, and was just shy of his fifty-eighth birthday.[9] Because of Claimant's age, Employer was required to pay his retirement benefits from Employer's Pension Trust. At age sixty-five, Claimant will begin to receive two pension checks. One from Employer and the other from the Pension Benefit Guaranty Corporation (PBGC).[10]

▪ Here, the WCJ found Scarfutti and Thomas as credible. The WCJ, as the ultimate fact finder in workers' compensation cases, has exclusive province over questions of credibility and evidentiary weight in whole or in part. *Greenwich Collieries v. Workmen's Compensation Appeal Board (Buck),* 664 A.2d 703, 706 (Pa.Cmwlth.1995). The function of this Court is to determine, upon consideration of the evidence as a whole, whether the WCJ's findings have the requisite measure of support in the record. *Bethenergy Mines Inc. v. W.C.A.B. (Skirpan),* 531 Pa. 287, 612 A.2d 434 (1992). Employer's evidence sufficiently met its burden to prove that it was entitled to an offset. This Court is constrained to reverse the decision of the Board.

Judge SMITH–RIBNER dissents.

### ORDER

AND NOW, this 17th day of June, 2009, the order the Workers' Compensation Appeal Board in the above-captioned matter is reversed.

---

9. Claimant was born on August 7, 1945. H.T. 10/08/03 at 6; R.R. at 9a.

10. When Bethlehem Steel went into bankruptcy, PBGC began the payment of pension benefits that amounted to eighty percent of Bethlehem Steel's original pension benefits paid to its former employees. N.T. 1/13/04 at 43; R.R. at 27a.